# EXHIBIT A

1

DOWNEY BRAND LLP
ANTHONY L. VIGNOLO (Bar No. 203933)

2

avignolo@downeybrand.com
3425 Brookside Road, Suite A

3

Stockton, California 95219
Telephone:     209.473.6450

4

Facsimile:     209.473.6455

5

Attorneys for Plaintiff
CHEROKEE FREIGHT LINES

6

STOCKTON LLC

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                           COUNTY OF SAN JOAQUIN

10

11 | CHEROKEE FREIGHT LINES STOCKTON,
LLC,

12

                    Plaintiff,

13

           v.

14

UKG, INC.; and

15 | DOES 1 through 10, inclusive,

16                    Defendants.

17

Electronically Filed
Superior Court of California
County of San Joaquin
2024-05-20 16:03:29
Clerk: Natalie Bashaw

Case Management Conference
2024-11-19 8:45AM in 10B

STK-CV-UBC-2024-0005931

Case No.

**COMPLAINT FOR:**

1) **Breach of Contract;**
2) **Unfair Business Practices
    Under Cal. Bus. And Prof. Code
    §§ 17200 *et. seq.*; and**
3) **Declaratory Relief**

Action Filed:      May 17, 2024
Trial Date:        Not Yet Assigned

18            Plaintiff CHEROKEE FREIGHT LINES STOCKTON, LLC, a California limited liability

19 company ("CFL" or "Plaintiff"), complains and alleges against Defendants UKG, INC., a

20 Delaware corporation ("UKG"), and DOES 1 – 10, inclusive, as follows:

21                                **THE PARTIES**

22            1.      Plaintiff is, and at all times relevant to this Complaint was, a California limited

23 liability company with its principal place of business in San Joaquin County, California.

24            2.      Plaintiff is informed and believes that Defendant UKG is, and all times relevant to

25 this Complaint was, a Delaware corporation with its principal place of business in Weston,

26 Florida, registered with the California Secretary of State, and doing business in California.

27            3.      The true names and capacities, whether individual, corporate, associate or

28 otherwise, of Defendant DOES 1-10, inclusive, are unknown to Plaintiff who therefore sues such

DOWNEY BRAND LLP

4125155.1

1

defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when the same have been ascertained. Plaintiff is informed and believes that each of said fictitiously-named defendants is responsible under the law in some manner, whether tortiously, negligently, in warranty, strictly, or otherwise, for the occurrences and happenings alleged herein, and that the injuries and damages alleged herein were proximately caused by such acts and/or occurrences.

4.    UKG and DOES 1-10 are collectively referred to hereinafter as "Defendants."

5.    Plaintiff is informed and believes that Defendants, and each of them, are responsible in some manner for the occurrences and happenings herein alleged, and that Plaintiff's injuries and damages as herein alleged were and are the direct and proximate result of the actions of said Defendants, and each of them. Such Defendants are sued as principals or agents, partners, servants and/or employees of such principals, or any combination thereof, and all of the acts performed by them as agents, partners, servants and/or employees were performed within the course and scope of their employment, and with the knowledge, consent, approval and ratification of such principals, and each of them.

## JURISDICTION AND VENUE

6.    The Court has subject matter jurisdiction over this action and personal jurisdiction over each of the parties. All or most of the events described herein occurred in San Joaquin County, California, a location in which Defendants also do business.

7.    Venue is proper in the above-entitled Court pursuant to section 395(a) of the Code of Civil Procedure because all or most of the events or omissions which gave rise to this action occurred in San Joaquin County, the contract at issue was entered into in San Joaquin County, and the damage to Plaintiff occurred in San Joaquin County.

## GENERAL ALLEGATIONS

8.    CFL, a national and diversified carrier of food grade commodities, had been utilizing the services of Paycom as its human resources information system ("HRIS") and payroll systems provider before deciding in May 2023 to transition those services to another provider.

///

DOWNEY BRAND LLP

DOWNEY BRAND LLP

*CFL Decides to Retain a New Provider*

9.      In connection with CFL's efforts to transition from Paycom to a new provider, CFL invited UKG to offer a presentation of its services in June 2023, including an explanation as to why CFL should consider transitioning such services to UKG as opposed to a different provider.

10.      The discussions between CFL and UKG were spearheaded by CFL Vice-President Adam Karp and UKG Account Manager William Feldman.  Mr. Karp made clear that CFL desired to transition away from Paycom as soon as possible.  In that regard, Mr. Karp inquired as to the timeframe for completing the platform integrations necessary for the transition and expressed serious concern over any potential for delays.  During those discussions, Mr. Feldman assured Mr. Karp that the timeframe for completing the platform integrations necessary to transition services from Paycom to UKG would be in the range of four (4) to six (6) months, with the former timeframe assuming a seamless process and the latter assuming potential snags being encountered along the way.  Nevertheless, Mr. Feldman assured Mr. Karp that a timeframe of 4 – 6 months would provide more than sufficient time to have the UKG system ready, tested, and fully functional for a "Go-Live" date of January 5, 2024 (the "Project").

11.      Relying upon Mr. Feldman's assurances, and particularly a "Go Live" date of not later than January 5, 2024, CFL executed UKG's standard form 4-page "Order Form" on June 29, 2023, identified as Quote No. Q-176703 (the "Contract"), a true and correct copy of which is attached hereto and incorporated herein as **Exhibit A**, and paid a deposit to UKG in the sum of $20,000.00.  The Contract includes a section entitled "Order Notes," which states: "Despite any Statement of Work linked above, UKG Launch shall be provided as set forth in the attached UKG Launch – UKG Pro Statement of Work."  However, no such document was attached to the Contract or ever provided to CFL.  The last paragraph of the "Order Notes" section, which is in smaller font than the preceding paragraph, states in relevant part that the Contract "is subject to and governed by the terms and conditions of UKG's Master Services Agreement located at: www.ukg.com/msa ... " (the "MSA").

///

///

DOWNEY BRAND LLP

***The On-Boarding Process***

12.     UKG did not begin the "Welcome and On-Boarding" phase of the Project until July 31, 2023, a month after the Contract was executed (the "On-Boarding Phase"). The On-Boarding Phase was led by UKG Implementation Advisor Brian Yao, who utilized the UKG Launch (the "Launch") methodology on smartsheets.com to manage timelines, task assignments, and capturing requirements. UKG defines the Launch methodology as:

> UKG's Launch methodology ('Launch') provides proven and repeatable processes that are supported with UKG standard tools, templates and proven training paths that deliver a successful launch of the Subscription Services. UKG and the Customer will collaborate throughout the Launch process performing tasks such as requirements workshops, system configuration, data conversion, integration configuration, testing cycles, production support, and project management.

13.     A portion of the Launch methodology included an "Integration Technical Questionnaire" that CFL completed as part of the information UKG required from CFL to begin the On-Boarding Phase. Through such questionnaire, CFL provided a list of all needed vendor integrations and a sample file from each vendor. The screenshots in UKG's smartsheet.com Launch site demonstrate that CFL gathered and timely provided all such required information to UKG between July – August 2023.

14.     The CFL leadership team, which included Mr. Karp, Phil Gill, and Robert Manetti, found the On-Boarding Phase useful and were impressed with Mr. Yao's management skills. This phase captured the tactical requirements for the Project, which were outlined in UKG's "Project Scope Summary Confirmation" document that UKG provided to CFL on July 31, 2023 (the "Project Summary"), a true and correct copy of which is attached hereto and incorporated herein as **Exhibit B**.

15.     The Project Summary included a callout of the integrations needed and expected at the "Go Live" date. Specifically, Page 2 of the Project Summary identifies necessary "EDI Integrations" with CFL's platforms for "GL, 401k, Benefits," and "API Integrations" with CFL's platform for "Electronic Logging (drivers)," the latter of which is provided through Samsara and is used for all drivers and thus a critical component to the integration.

4

16.     Consistent with the assurances provided by Mr. Feldman to Mr. Karp, Page 3 of the Project Summary identifies the "Target Live Date" as January 1, 2024, and the "First Live Check Date" as January 5, 2024.  Page 6 of the Project Summary states in relevant part: "Approval of the Project Scope Summary Confirmation document confirms an understanding of the high-level project expectations including the products and services purchased as well as target live dates." Page 6 of the Project Summary further states:

> As an authorized approver on the Project Leadership team, I agree with the following statements regarding the scope of the project:
>
> - The Project Scope Summary Confirmation accurately reflects our understanding of contracted services.
>
> - I understand that additional functionality can be added to this set of deliverables after signing; however new items cannot be guaranteed to be delivered by the stated live date. If they are required as part of 'go-live deliverables', this could potentially impact the live date stated in this document.

### UKG Fails to Make Progress and Delays the "Go Live" Date

17.     After successfully completing the On-Boarding Phase of the Project, as outlined in the UKG Launch methodology, Mr. Yao turned the Project over to the UKG implementation team on September 11, 2023, to begin the "Implementation Phase" (the "Implementation Phase"). UKG Project Manager Jason Martini thereafter assumed management responsibilities for the Project.  Unfortunately, the Implementation Phase was a miserable failure by UKG, as reflected through the following timeline summary of events and correspondences:

(a)     September 15, 2023:  Mr. Martini of UKG was out of the office for the first week of the Implementation Phase, and thus handed off management of the Project during such time to one or more other UKG personnel;

(b)     September 25, 2023:  The UKG implementation team began "Full Suite Analysis," which involved work that was largely duplicative of work from the On-Boarding Phase, including documentation generated during the On-Boarding Phase and captured on smartsheet.com that was not reused or referenced;

(c)     September 27, 2023:  The UKG implementation team began "Initial Data Gathering," which once again involved work that was largely duplicative of work

DOWNEY BRAND LLP

from the On-Boarding Phase, including documentation generated during the On-Boarding Phase and captured on smartsheet.com that was not reused or referenced;

(d)    October 4, 2024:  Representatives of CFL and UKG had a conference call regarding the Project, which was the first conference call that occurred since Mr. Martini assumed management responsibilities for the Project on behalf of UKG.  Inexplicably, Mr. Martini began managing the Project through a Microsoft Word document that he shared during the conference call on October 4, 2024, and during future conference calls, rather than utilizing the Launch methodology as established on smartsheet.com during the On-Boarding Phase;

(e)    October 9, 2024 - Nov 7, 2023:  The UKG "Configuration Phase" began, and weekly Project meetings led by Mr. Martini continue to be run from the Microsoft Word document referenced above, without any tangible tracking or accountability, while the UKG Launch methodology platform on smartsheet.com continued to not be utilized;

(f)    November 7, 2023:  Mr. Gill of CFL expressed CFL's concerns regarding Mr. Martini to UKG Account Manager William Feldman by email, highlighting the primary concern that Mr. Martini's mismanagement is leading to delays and misinformation with the integrations, specifically with the Samsara integration which will handle the timekeeping for drivers and which is critical for CFL's success.  Unfortunately, UKG failed to address CFL's concerns or propose any form of resolution;

(g)    November 28, 2023:  Sherrell Davis of UKG reported for the first time that all integrations other than the 401k integration will not be available until June 2024, and further reported that the 401k integration will "likely" be available in late January 2024;

(h)    November 29, 2023:  UKG confirmed at the Project meeting that UKG will be unable to provide integrations by the previously stated "Go Live" date of January 5, 2024;

(i)    <u>November 30, 2023</u>:  Mr. Manetti of CFL made clear to UKG that the "Go Live" date cannot proceed without 401k integration proven to be working ahead of such date, and in response UKG requested that CFL pay for such integrations.  Such request was not only inconsistent with all prior discussions and UKG's own Project Summary, but was never even previously mentioned as a possibility when CFL outlined the needed integrations.  UKG advised CFL that the charge for such ten (10) integrations would start at $2,000.00 each, although in response to CFL's concerns UKG agreed to reduce such charge to $5,000.00 total for all the integrations;

(j)    <u>December 7, 2023</u>:  UKG's Senior Manager of Professional Services Consulting, Pam Christman, sent an email to CFL offering better costs and timelines, which CFL is informed and believes was the result of CFL expressing its concerns regarding UKG's failure to perform under the Contract;

(k)    <u>December 8, 2023</u>:  Mr. Martini and Ms. Christman sent a joint email on behalf of UKG identifying a revised timeline for all integrations to be completed, and presented options for a revised "Go Live" date, with the only viable option for full-integration delaying the "Go Live" date to July 2024.  Mr. Karp responded by email of the same date on behalf of CFL, stating:

> This new July, 2024 go live date is not going to work for us and we've already been very clear in our position that we won't be able to go live without a fully functioning system. This leaves us in a terrible spot as neither option below are viable options for us. This is why we need to speak ASAP to discuss if, how we move forward. I was hoping we could have talked earlier today. In light of the options provided below, we're now on hold on our side. Please let the UKG team know to hold off any meetings that were previously scheduled until we decide next steps.

> Please let me know as soon as you guys are available for a call.

Ms. Christman responded to Mr. Karp by email of the same date, stating: "My Director and I are available to meet with you at 4:00 or 4:30 PST – would that

DOWNEY BRAND LLP

1    work?  Otherwise, Jason we will look to move up the call early next week.  Please

2    advise."

3    (l)    <u>December 11, 2023</u>:  Representatives of UKG (David Canup and Pam Christman)

4    participated in a conference call with representatives of CFL (Adam Karp and Phil

5    Gill) and represented to CFL's representatives that the Project is on time and on

6    track and that UKG's services are ready for "Go-Live" in January 2024.  During

7    such call, CFL's representatives reiterated that integrations are a vital component of

8    the system's efficacy, as UKG itself documented in the Project Summary.  UKG's

9    representatives responded by stating that the integrations were never part of the

10    Contract, while CFL asserted to the contrary and reiterated that such integrations

11    were specifically discussed throughout the entire process, including prior to

12    entering into the Contract, and that UKG was clearly aware of the need for the

13    integrations and the fact they are critical for a successful launch.  Mr. Karp also

14    suggested during the conference call that the parties simply part ways, which UKG

15    resisted and requested that CFL provide a formal letter in such regard;

16    (m)    <u>December 15, 2023</u>:  Mr. Karp sent an email on behalf of CFL to Mr. Canup,

17    stating:

18            Thank you for the time on our call earlier this week.

19            As you suggested, I am writing to express our interest
               to work through the steps needed to terminate our
20            business relationship. I wanted to provide you with a
               brief background and summary why we made the
21            decision originally to move to UKG as I feel that's
               important to our position today. Then propose a
22            potential quick resolution.

23            We ultimately entered into an agreement with UKG
               based on the assurance that UKG would deliver a
24            complete system ready for launch in January 2024,
               alongside an ongoing service and product experience
25            we could rely on.  This commitment was a significant
               factor in our decision to collaborate with UKG.

26            Originally, our PAYCOM system was meeting CFL's
               core needs. However, despite PAYCOM's
27            operational efficacy, the service aspect led to our
               decision to seek a new partner. When we transitioned
28            to UKG, we were assured of a service experience far

DOWNEY BRAND LLP

DOWNEY BRAND LLP

superior to what we had previously encountered.
Unfortunately, our experience with UKG has not
lived up to these assurances. We are currently facing
a six-month delay for go-live, incurring additional
time and financial costs. This situation has
regrettably eroded our confidence in the promised
service experience following the launch.

In the interest of both parties, we propose to negotiate
a good faith separation. In the hopes of a quick
resolution, CFL is willing to forego any credit or
refund of the $20,000 already invested in UKG's
LAUNCH professional services, recognizing the
efforts made thus far. Regarding the subscription
service, we seek to terminate the agreement before its
commencement.

Our goal is to resolve this situation swiftly and
amicably. We are open to discussing the most
effective way to conclude our agreement and are
ready to engage in discussions at your earliest
convenience.

We understand that this decision is not ideal for
either party. However, we believe that an amicable
and efficient resolution is in our mutual best interest.
We look forward to your response and hope to find a
path that minimizes inconvenience and fosters
goodwill between our companies.

(n)     December 27, 2023:  After not receiving any response from UKG to his email of

December 15, 2023, Mr. Karp sent a further email to Mr. Canup, stating: "I wanted

to follow up to get your thoughts on the proposed resolution below. Please let me

know what you think about resolving this amicably."

(o)     December 28, 2023:  After still not receiving any response from UKG, Mr. Karp

sent a further email to Mr. Canup, stating:

I wanted to follow up once more to see how you feel
about the below resolution proposal. I've copied Pam
in case you are out of the office as I haven't heard
back from you. We do need to bring this to a
resolution and as stated below, we are hoping we can
resolve this smoothly. If the below is not something
UKG is open to for some reason, let me know as
we'll then need to take the next steps to try and
resolve this as easily as possible.

(p)     December 29, 2023:  Mr. Canup responded to Mr. Karp, stating: "I apologize for

the delay.  I will follow up with my internal teams on Tuesday.  Would you have

DOWNEY BRAND LLP

time to meet next week so I can give you updates?  Please let me know your availability."  Mr. Karp responded by email of the same date, stating:

> At this point my schedule is open Wednesday after 1:00pm PST. If you'd like to schedule a call, let me know what time Wednesday afternoon will work best for you.
>
> Have a great New Year and I look forward to talking to you next week in the hopes we can reach a quick resolution.

(q)    January 10, 2024:  Mr. Karp sent an email to Mr. Canup, again with a copy to Ms. Christman, stating: "I haven't heard from anyone at UKG regarding the resolution of this.  I believe you anticipated I would hear something Monday or Tuesday.  Please let me know when I can expect to hear something as we'd clearly like to get this resolved and behind us."

(r)    January 11, 2024:  Mr. Canup responded to Mr. Karp by email, stating: "Adam, I will be able to follow up with this today."

(s)    January 12, 2024:  Mr. Karp sent an email to Mr. Canup, again with a copy to Ms. Christman, stating: "I still haven't heard anything on this."

(t)    January 16, 2024:  Mr. Karp sent a further email to Mr. Canup, again with a copy to Ms. Christman, stating:

> As of today, I still have not heard from anyone with a confirmation of what we've discussed regarding terminating our contract.  I sent you our termination request, with a proposal as you requested back on December 15th.  I have followed up several times and haven't been able to get this resolved.  We spoke on Friday and you apologized again for the continued delay and let me know you would email me with the contact information of the person that you mentioned I will need to talk with for the termination confirmation (I believe you mentioned his name was Tim?).  I haven't received that email, or been contacted by anyone else at UKG.
>
> When you and I talked, we both agreed it would be best to end things on as much of a positive note as possible.  Yet, I can't seem to get an official confirmation from you, or anyone else at UKG.  Unfortunately, I can't keep waiting.  If I can't get

10

COMPLAINT

1                     some type of confirmation by the end of this week
that what I proposed back on December 15th is

2                     agreeable, I will have no choice, but to escalate this
and look to terminate based on cause due to the

3                     various shortcomings by some of the UKG team
during this process that led to this project falling

4                     short of what we were promised.  If we're forced to
go that route, we will be seeking a return of all our

5                     costs. I'm still hoping we can avoid this, but will
need an official response by the end of this week.

6

7                     Please let me know UKG's position ASAP.

8         (u)     January 17, 2024:  Nikki Aitken, a new UKG customer service representative,

9 entered the picture and emailed Mr. Karp, with a copy to Ms. Canup and Ms.

10 Christman, stating:

11                     Hi Adam – thank you for the follow up, and I
apologize for the delay.  We're still trying to get

12                     caught up on customer requests that came in over the
holidays/year-end, but David did pass this along as

13                     soon as you made us aware of your intent to
terminate the partnership.  Can we schedule some

14                     time to connect next week?  I'm out of the office
tomorrow and just want to ensure I have all of the

15                     contract details and history on the project before we
meet.  Let me know what suits and we'll get

16                     something on the calendar.

17 Mr. Karp responded to Ms. Aitken by email of the same date, stating:

18                     I was told we were already past the discovery phase
and the need for UKG to now look into the contract

19                     details and history on the project.  This has been
lingering for over a month without an answer and we

20                     need to reach a resolution one way or another.  I was
told that I was just waiting for a final confirmation

21                     from the right department that what I proposed was
agreeable.  Will you be able to provide a final official

22                     answer when we speak next week?

23                     I'm available Monday between 9am-12:00pm PST.

24 Ms. Aitken responded by email of the same date, stating: "Hi Adam – yes, I will be

25 able to provide an answer when we meet next week.  Can you propose a time for

26 Wednesday or Thursday?  I need a couple of days internally to pull together the

27 contract details and meet with the project team."  Mr. Karp responded by email of

28 ///

DOWNEY BRAND LLP

DOWNEY BRAND LLP

1   the same date, stating: "I can make myself available Wednesday from 9:00am-

2   12:00pm PST."

3   (v)   January 25, 2024:  After several weeks of nudging and fruitless negotiations, UKG

4   demanded a year's payment to terminate the Contract.  By email to Mr. Karp on

5   January 25, 2024, Ms. Aitken stated on behalf of UKG:

6   Hi Adam – thank you for taking the time to speak
    with me yesterday.  As we discussed yesterday, UKG
7   is not aligned to the proposal Cherokee has set forth,
    which is to end the partnership and forgo all
8   subscription fees, considering the $20,000 Launch
    fees that have already been paid Cherokee's only
9   financial obligation.  UKG remains committed to
    delivering the project as scoped; if Cherokee wishes
10  to terminate the relationship prior to fulfillment of the
    initial contract term, we will seek additional payment
11  of one year of the subscription fees, totaling
    $115,200.

12
    I realize what the likely next steps are based on our
13  conversation, and I am already engaged with our
    legal counsel on that front.  Please let me know how
14  you would like to proceed.

15  ***CFL Sends UKG a Notice of Intent to Terminate for Cause***

16  18.   Section 7.2.2 of the MSA states in relevant part:

17  7.2.2 **For Cause**. Either Party may terminate this Agreement, or any
    Service identified in an Order, if the other Party fails to perform any
18  material obligation under this Agreement, and such Party is not able
    to cure the non-performance within thirty (30) days of written notice
19  of such default with reasonably sufficient detail regarding the
    alleged breach … .

20
    19.   By written correspondence dated February 22, 2024, by and through its legal
21
    counsel, CFL sent a "Notice Of Intent To Terminate For Cause" to UKG, a true and correct copy
22
    of which is attached hereto and incorporated herein as **Exhibit C** (the "Termination Notice").  The
23
    Termination Notice states in relevant part:
24
25  [A]lthough CFL disputes the validity and
    enforceability of the MSA, CFL is willing to provide
26  UKG with an opportunity to 'cure the breaches
    and/or anticipatory breaches identified above
27  pursuant to Section 7.2.2 of the MSA, and CFL does
    so strictly for the purpose of this correspondence and
28  without in any way, expressly or impliedly, waiving
    such position. If UKG is not willing or able to timely

4125155.1

COMPLAINT

1      cure such issues, the Contract will be deemed
2      terminated pursuant to Section 7.2.2 of the MSA.

3      20.      The Termination Notice, which addressed UKG's failure to perform with respect to

4  the Project's "Go Live" date and CFL's concerns regarding recently discovered data breaches that

5  impacted UKG customers, made clear that the Contract would be deemed terminated if UKG

6  failed to perform and provide the assurances requested by CFL within thirty (30) days of UKG's

7  receipt of the Termination Notice.  UKG failed to perform under the Contract, failed to provide the

8  assurances requested by CFL, on or before such 30-day deadline, and refused to acknowledge

9  CFL's proper termination of the Contract.

10                            **CAUSES OF ACTION**

11                            **FIRST CAUSE OF ACTION**

12                    **(Breach of Contract – Against Defendant UKG)**

13      21.      Plaintiff realleges and incorporates herein the allegations set forth in Paragraphs 1

14  through 20, as though fully set forth herein.

15      22.      Defendant breached the Contract by failing to have the UKG system ready, tested,

16  and fully functional for a "Go-Live" date of January 5, 2024, and—setting aside CFL's position

17  that the MSA was not properly incorporated into or otherwise part of the Contract—by failing to

18  perform and provide the assurances requested by CFL within thirty (30) days of UKG's receipt of

19  the Termination Notice.

20      23.      Plaintiff has performed all terms and conditions of the Contract required on its part

21  to be performed, except those terms and conditions for which performance has been excused as a

22  result of the conduct of UKG.

23      24.      Plaintiff has incurred, and will continue to incur, damages, including, but not

24  limited to, wages and other expenses incurred in connection with the Project, and a down payment

25  of $20,000.00 paid by Plaintiff to UKG.

26  ///

27  ///

28  ///

DOWNEY BRAND LLP

DOWNEY BRAND LLP

**SECOND CAUSE OF ACTION**

**(Unfair Competition/Cal. Bus. & Prof. Code, §§ 17200, *et seq*. – Against All Defendants)**

25.    Plaintiff realleges and incorporates herein the allegations set forth in Paragraphs 1 through 24, as though fully set forth herein.

26.    In connection with the Contract and the Project, Defendants engaged in a series of unlawful, unfair, and fraudulent business acts and practices in violation of the California Unfair Competition Law ("UCL"), California Business and Professions Code sections 17200 *et seq*. Specifically, as alleged herein, Defendants made false promises and other assurances to Plaintiff, including assurances of a "Go Live" date of not later than January 5, 2024, all in furtherance of inducing Plaintiff to enter into the Contract.  After Plaintiff agreed to enter into the Contract, Defendants provided Plaintiff with UKG's standard form 4-page "Order Form," which Plaintiff executed on June 29, 2023, although Defendants failed to provide Plaintiff with various documents that Defendants now assert are part of the Contract.  Specifically, although the Contract states that the "UKG Launch – UKG Pro Statement of Work" was attached thereto, no such document was attached or ever provided to Plaintiff.  In addition, UKG included a section in the Contract in small font stating that the Contract "is subject to and governed by the terms and conditions of UKG's Master Services Agreement located at: www.ukg.com/msa ...," although UKG failed to call such section to CFL's attention or ever provide CFL with a copy of the MSA. The MSA, which Plaintiff contends is not binding or enforceable, includes various provisions, including a provision – which is unlawful and unenforceable under California law – providing for exclusive venue in Massachusetts for any disputes arising from the Contract.

27.    Plaintiff is informed and believes that Defendants engaged, and continue to engage, in the practices alleged herein so as to unlawfully and/or unfairly increase their leverage in disputes arising from UKG's failure to perform and corresponding customer demands for contractual termination.

28.    The wrongful conduct of Defendants, as alleged above, constitutes unlawful, unfair, and fraudulent business acts and practices in violation of the California Unfair Competition Law ("UCL"), California Business and Professions Code sections 17200 *et seq*.

29.     California Business and Professions Code section 17203 authorizes injunctive and restitutionary relief against any person who has engaged or proposes to engage in unfair competition.  Unless and until enjoined, Defendants, and each of them, will continue to engage in the unlawful, unfair and deceptive business practices alleged herein.

30.     As a direct and proximate result of Defendants' statutory unfair competition, Defendants have been unjustly enriched and are subject to disgorgement in an amount to be determined at trial.

31.     Plaintiff requests that the Court issue injunctive relief against Defendants and their agents, servants, employees, and all persons acting thereunder, in concert with or on their behalf.

<u>**THIRD CAUSE OF ACTION**</u>

**(Declaratory Relief – Against UKG)**

32.     Plaintiff realleges and incorporates herein the allegations set forth in Paragraphs 1 through 31, as though fully set forth herein.

33.     This Court is authorized to grant declaratory judgments.

34.     An actual controversy exists between CFL and UKG relative to the rights and duties under the Contract, including, but not limited to, CFL's termination of the Contract, the validity and enforceability of the MSA, and the failure of UKG to perform.

35.     Plaintiff desires a judicial determination, which is necessary and appropriate at this time, as to the issues set forth above, and such a judicial declaration is necessary and appropriate at this time under the circumstances so that CFL and UKG may determine their respective rights and remedies against each other under the Contract and MSA.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For compensatory damages;

2.     For injunctive relief to enjoin the unlawful and/or unfair business practices deployed by Defendants;

3.     For an award to Plaintiff of all amounts by which Defendants have been unjustly enriched, including without limitation Defendants' profits attributable to

DOWNEY BRAND LLP

1          Defendants' unauthorized conduct;

2      4.    For reasonable attorneys' fees as allowed by law or contract;

3      5.    For an award to Plaintiff of prejudgment interest as provided by law; and

4      6.    For such other relief as the Court may deem just and proper.

5    DATED:  May 20, 2024                    DOWNEY BRAND LLP

6

7                                      By: _____
                                            ANTHONY L. VIGNOLO
8                                          Attorneys for Plaintiff
                                       CHEROKEE FREIGHT LINES
9                                          STOCKTON, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOWNEY BRAND LLP

# Exhibit A

DocuSign Envelope ID: 68E50C7C-12A5-47A4-B9D5-0EF37B8F2663    Case 1:24-cv-12714-ADB    Document 1-3    Filed 06/28/24    Page 19 of 59

Quote#: Q-176703
Page 1/4



**ORDER FORM**

**Quote#: Q-176703**
**Expires: 20 Jul, 2023**
**Sales Executive: William Feldman**
**Effective Date: Effective as of the date of last signature of this Order**
**Division: Strategic - Southwest**

**Order Type: Quote**
**Date: 28 Jun, 2023**

---

**Customer Legal Name: Cherokee Freight Lines**
**Stockton LLC**

**Customer Legal Address:**
**3655 Cherokee Rd, Stockton, CA**
**95205-2403 USA**

**Ship To Contact: Adam Karp**

**Bill To Contact:**

**Ship To: Cherokee Freight Lines Stockton LLC**
**3655 Cherokee Rd**
**Stockton, CA 95205-2403 USA**

**Bill To: Cherokee Freight Lines**
**P.O. Box 5509**
**Stockton, CA 95215 USA**

**Ship to Phone: (209) 444-7344**
**Contact: Adam Karp**
**Email: akarp@gocfl.com**

---

**Currency: USD**
**Customer PO Number:**
**Solution ID: 6198884**
**Initial Term: 36 months**
**Uplift Percent: 5 %**

**Renewal Term: 12 months**
**Payment Terms: Net 30 Days**

**Billing Start Date: 274 Days from the Effective Date; unless**
**otherwise stated below.**
**Data Center Location: USA**

---

**Payment Fees**

A) Subscription Fee

The Subscription Fees for the applicable monthly Minimum Quantities are due quarterly and invoiced thirty (30) days in advance of the quarter.

To reconcile the actual employee counts, promptly following the end of each quarter term starting from the Billing Start Date, UKG will invoice Customer for the actual number of employees in each month of the previous quarter term that exceeded the Monthly Minimum Quantity.

---



The monthly subscription amount (number of employees multiplied by the applicable Subscription Fee) may increase or decrease if the number of employees increases or decreases, but in no event shall the monthly Subscription Fee be calculated on less than the Monthly Minimum Quantity below.

After the Initial Term, the Subscription Fee shall increase per annum by the Uplift amount set forth above.

## Subscription Services

| Subscription Services | Monthly Minimum Quantity | Employee Type | Subscription Fee Per Employee Per Month | Billing Start Date / Billing Frequency |
|---|---|---|---|---|
| Includes UKG PRO PAY AND PEOPLE CENTER,UKG PRO WORKFORCE MANAGEMENT (HOURLY),UKG PRO ABSENCE,UKG PRO DOCUMENT MANAGER,UKG PRO PEOPLE ASSIST,UKG PRO EMPLOYEE VOICE,GREAT PLACE TO WORK CERTIFICATION - ASSESS TIER,INCOME AND EMPLOYMENT VERIFICATION FROM EQUIFAX,UKG PRO ONBOARDING,UKG PRO PAY,UKG PRO PEOPLE CENTER,UKG PRO PAYMENT SERVICES,UKG PRO BENEFITS ENROLLMENT,UKG PRO BASIC SSO,UKG PRO MODEL MY PAY,UKG PRO DATA EXCHANGE SERVICES,UKG PRO ACA SERVICES,UKG PRO ACCRUAL,UKG PRO TIMEKEEPING HOURLY,UKG PRO WAGE ATTACHMENT DISBURSEMENT,UKG PRO TAX FILING SERVICES,UKG PRO CHECK PRINTING | 320 | Compensated Employees | USD 29.00 | 274 Days from the Effective Date / Quarterly in Advance |
| Includes UKG PRO HR ONLY/GLOBAL EMPLOYEES | 0 | People Center Employees | USD 4.00 | 274 Days from the Effective Date / Quarterly in Advance |
| Includes UKG PRO LIMITED ACCESS | 0 | Limited Access Employees | USD 1.00 | 274 Days from the Effective Date / Quarterly in Advance |

## Professional Services
Billing Frequency: Billed 100% upon signature of the order form

| Professional Services | Total Price |
|---|---|
| UKG LAUNCH FIXED FEE | USD  20,000.00 |
| **Total Price** | **USD 20,000.00** |

## Quote Summary



| Item | Total Price |
|---|---|
| Minimum Monthly Subscription Services Fees | USD 9,279.94 |

| Item | Total Price |
|---|---|
| Total Professional Services Fees | USD 20,000.00 |

**Order Notes:**

Despite any Statement of Work linked above, UKG Launch shall be provided as set forth in the attached UKG Launch – UKG Pro Statement of Work. UKG Launch is based on the Launch Quantity of 390 employees. In the event that the number of Customer's employees exceeds 110% of the Launch Quantity herein as of the applicable Subscription Service live date, then Customer agrees to pay UKG $185.00 per each additional employee. For clarification purposes, this additional Launch fee if applicable shall only be charged to Customer as of the applicable Application live date and Customer shall not be charged for any additional Launch fees subsequent to that date.

During the Initial Term, in the event Customer has a significant change in business resulting in a reduction of more than twenty percent (20%) of the minimum number of Compensated Employees for more than three (3) consecutive months, Customer shall notify UKG of such reduction and upon such notification, the Parties agree to in good faith renegotiate the minimum number of Compensated Employees, including the decrease or increase, if any, of the fees.

This Order is subject to and governed by the terms and conditions of UKG's Master Services Agreement located at: www.ukg.com/msa (hereafter, "Agreement"). All versions of the Master Services Agreement, including the version effective as of the Effective Date of this Order and prior versions, can be found at: www.ukg.com/global-msas UKG will provide the Services in accordance with the Services Descriptions and Statements of Work located at: www.ukg.com/services-descriptions UKG will provide the Support Services in accordance with the UKG Support Policy located at: www.ukg.com/support-policies-and-services All Customer Data (as defined in the Agreement) will be secured and protected as set forth in the Technical and Organizational Measures of UKG's Data Processing Addendum. Any personal data provided to UKG through the Subscription Services will be processed in accordance with UKG's Data Processing Addendum located at: www.ukg.com/ukg-unified-dpa Customer's use of the Subscription Services is further subject to the Acceptable Use Policy located at: www.ukg.com/acceptable-use-policy



IN WITNESS WHEREOF, the parties have caused this Order to be executed by their authorized representatives and shall be effective as of the date of the last signature below.

| **Cherokee Freight Lines Stockton LLC** | | **UKG Inc.** | |
|---|---|---|---|
| Signature: | *Adam Karp*  ⸺83CC720E0073443... | Signature: | *Scott Giangrande*  ⸺7074C511ADA043B... |
| Name: | Adam Karp | Name: | Scott Giangrande |
| Title: | Vice President | Title: | Sr. Order Processing Analyst |
| Date: | 29-Jun, 2023 | Date: | 30-Jun, 2023 |

The monthly price on this Order has been rounded to two decimal places for display purposes. As many as eight decimal places may be present in the actual price. Due to the rounding calculations, the actual price may not display as expected when displayed on your Order. Nonetheless, the actual price on your invoice is the true and binding total for this Order for purposes of amounts owed for the term.

# Exhibit B

# UKG Launch Project
## Project Scope Summary Confirmation



The Project Scope Confirmation outlines work to be performed, and communicate assumptions involved with the project. Customer's project team must review and sign this document to ensure the UKG project team is aware of the project objectives and demonstrates an understanding of the overall scope of this project, based upon information provided to date and subject to change based on further discovery during analysis as well as the Launch Agreement.

# Company Information

| Company Information | | |
|---|---|---|
| AR# | CHE1500 | |
| Company Name | Cherokee Freight Lines | |
| Company Website | http://www.gocfl.com | |
| Main Location (City, State, Providence) | 3655 Cherokee Rd Stockton, CA 95205-2403 | |
| Main Location Time Zone | PST | |
| # of FEINs/BNAs/Legal Entities | US: | 4 |
| | CAN: | 0 |
| | International: | 0 |
| Total Current Employee Count | 320 | |
| Current Employee Count | US: | 320 |
| | CAN: | 0 |
| | International: | 0 |
| # of Physical Locations | US: | 2 |
| | CAN: | 0 |
| | International: | 0 |
| Pay Frequency(s) | US: | Weekly |
| | CAN: | N/A |
| | International: | N/A |
| Number & List of US States Employees are Taxed in | 5-10 | |
| | Arizona, California, Idaho, Nevada, Oklahoma, Oregon, Texas, Washington | |
| Local Taxes (US)<br>AL, CO, IN, KY, MD, MI, MO, NM, NV, NY, OH, OR, PA, WA, WV | OR | |
| Canadian Provinces/Territories in Scope | N/A | |
| Quebec Reporting | N/A | |
| Countries in Scope Outside of US & Canada | N/A | |
| Number of Unions | 4 | |
| Non-Profit | No | |

1

© 2020 UKG Inc. All rights reserved.



| Company Information | |
| --- | --- |
| Migrating from PEO | No |
| Language Requirements | |
| Additional Notes | |
| | |

# Current System Information

| Current System Information | | |
| --- | --- | --- |
| Current HR System(s) | US: | Paycom |
| | CAN: | N/A |
| | International: | N/A |
| Current Payroll System(s) | US: | Paycom |
| | CAN: | N/A |
| | International: | N/A |
| Current Time & Attendance System(s) | US: | Paycom, Electronic Logging (drivers) |
| | CAN: | N/A |
| | International: | N/A |
| Current Scheduling System(s) | US: | N/A |
| | CAN: | N/A |
| Current Financial System(s) (GL) | US: | Mcleod |
| | CAN: | N/A |
| EDI Integrations | GL, 401k, Benefits | |
| API Integrations<br><br>*Customer is responsible for delivery (including setup & testing) of API integrations by leveraging the provided UKG API Guides and developer resources* | Electronic Logging (drivers) | |
| Custom Reports | | |

2

© 2020 UKG Inc. All rights reserved.

UKG

| Current System Information | |
|---|---|
| Historical Employee Data | history from 2020 on |
| Additional Notes | |

## UKG Applications and Target Dates of Deployment

| UKG Application | In Scope | Target Live Date | | |
|---|---|---|---|---|
| **Human Resources and Payroll** | | | | |
| US Pay and People Center | ☑ | 01/01/24 | First Live Check Date: | 01/05/24 |
| US People Center Only | ☑ | 01/01/24 | | |
| US Pay Only | ☑ | 01/01/24 | | |
| Canada Pay and People Center | ☐ | N/P | First Live Check Date: | N/P |
| Canada People Center Only | ☐ | N/P | | |
| Canada Pay Only | ☐ | N/P | | |
| Global People Center | ☑ | N/A | | |
| Position Management | ☐ | | | |
| Human Resources and Payroll Notes | | | | |
| **Time & Labor Management** | | | | |
| Workforce Management | ☑ | 01/01/24 | Pay Period US: | 12/23-12/29 |
| | | | Pay Period CAN: | N/P |
| WFM - Pro Absence | ☑ | P2 | | |
| WFM - Pro Scheduling | ☐ | N/P | | |
| WFM - Pro Advanced Scheduling | ☐ | N/P | | |
| WFM - Pro WFM Analytics | ☐ | N/P | | |
| WFM - Pro Activities | ☐ | | | |
| Time & Scheduling | ☐ | N/P | | |
| Clock Hardware | ☐ | Estimated # of Clocks: | | |

3

| UKG Application | In Scope | Target Live Date | | |
|---|---|---|---|---|
| Global Time Keeping | ☐ | US | | |
| Time & Labor Management Notes | | | | |
| | | | | |

| Benefits Administration & Comp | | | | |
|---|---|---|---|---|
| Pro Benefits – Open Enrollment | ☑ | P2 | Open Enrollment Start: | 08/01/23 |
| | | | Benefit Effective Date: | 09/01/23 |
| Pro Benefits – Life Events | ☑ | | P2 - Target within 0-30 days of HR go-live | |
| Benefits Administration (Prime) | ☐ | N/P | | |
| Benefits API (Third Party Provider) | ☐ | | N/A - Not in scope | |
| Compensation | ☐ | | N/A - Not in scope | |
| Benefits Administration & Comp Notes | | | | |
| | | | | |

| Talent Acquisition | | | | |
|---|---|---|---|---|
| Recruiting | ☐ | | N/A - Not in scope | |
| Onboarding | ☑ | | P2 - Target within 0-30 days of HR go-live | |
| Talent Acquisition Notes | | | | |
| | | | | |

| Talent Management | | | | |
|---|---|---|---|---|
| Performance Reviews | ☐ | | N/A - Not in scope | |
| Succession | ☐ | | N/A - Not in scope | |
| Coaching & Development | ☐ | | N/A - Not in scope | |
| Talent Management Notes | | | | |
| | | | | |

Project Scope Summary Confirmation

© 2020 UKG Inc. All rights reserved.



| UKG Application | In Scope | Target Live Date | |
|---|---|---|---|
| **Human Resource Service Delivery** | | | |
| Document Manager | ☑ | | TBD - To be discussed further with Launch Team |
| People Assist | ☑ | | TBD - To be discussed further with Launch Team |
| Human Resource Service Delivery Notes | | | |
| | | | |
| **Workforce Intelligence** | | | |
| Voice | ☑ | | P2 - Target within 0-30 days of HR go-live |
| Learning | ☐ | | N/A - Not in scope |
| Workforce Intelligence Notes | | | |
| | | | |

| **Payment and IT Services** | |
|---|---|
| US Payment Services – Tax Filing | ☑ |
| US Payment Services – Wage Attachment | ☑ |
| US Payment Services – 1099 Filing | ☐ |
| Canada Payment Services – Tax Filing | ☐ |
| US New Hire Reporting | ☑ |
| US Multi Worksite Reporting | ☑ |
| US Employee Pay | ☑ |
| US ACA Services | ☑ |
| Managed Services | ☐ |
| Print Services | ☑ |
| Test Environment Services | ☐ |
| Single Sign-On (SSO) | ☑ |
| Payment and IT Services Notes | |
| | |

5

© 2020 UKG Inc. All rights reserved.

UKG

## Launch Assumptions

1. Project will be managed per the UKG Launch Methodology section referenced in the SaaS Agreement.

2. If the first Live Payroll in UKG is processed other than the first check in January, Customer is responsible for any notices, adjustments, or amendments for items prior to the first live check date.

3. Customer's business environment will not impact the implementation (e.g., no acquisitions or major organizational changes anticipated).

4. Customer's project team members will attend all necessary UKG training courses.

5. This project may require an additional account setup or authorization with Customer's bank.

6. Customer is responsible for maintaining all aspects of UKG Pro security administration.

7. UKG and Customer management support will be readily available to resolve issues to avoid negative impact on the project schedule and/or cost.

8. Assumes Customer provides committed team members to facilitate timely decisions, effective communication, issue resolution, and tasks completion.

9. User procedures, communication, and training of employees are the responsibility of Customer.

10. Customer is responsible for executing and validating test results with support from the Launch team.

11. This Project Scope Confirmation document will be reviewed and, together with the requirements document in the Launch Tool, signed-off prior to proceeding with configuration.

## Project Scope Summary Confirmation Approval

Approval of the Project Scope Summary Confirmation document confirms an understanding of the high-level project expectations including the products and services purchased as well as target live dates.

While this is not a contract, it does help all parties involved understand the overall scope and timeline.

As an authorized approver on the Project Leadership team, I agree with the following statements regarding the scope of the project:
- The Project Scope Summary Confirmation accurately reflects our understanding of contracted services.
- I understand that additional functionality can be added to this set of deliverables after signing; however new items cannot be guaranteed to be delivered by the stated live date. If they are required as part of 'go-live deliverables', this could potentially impact the live date stated in this document.

## Acknowledgement

**COMMENTS:**

Project Scope Summary Confirmation

© 2020 UKG Inc. All rights reserved.



**ACCEPTED BY:**

      _____

      **Approver-Name**


**DATE:**

7



# Exhibit C

**DOWNEY**BRAND

Anthony L. Vignolo
avignolo@downeybrand.com
209.472.3920 Direct
209.472.3921 Fax

Downey Brand LLP
3425 Brookside Road, Suite A
Stockton, CA 95219
209.473.6450 Main
downeybrand.com

February 22, 2024

<u>**VIA CERTIFIED MAIL & U.S. REGULAR MAIL**</u>

UKG Inc.
Attn: Elizabeth McCarron
EVP Chief Legal Officer
900 Chelmsford Street
Lowell, MA 01851

**Re:    Cherokee Freight Lines Stockton LLC – Order No. Q-176703**
**         NOTICE OF INTENT TO TERMINATE FOR CAUSE**

Dear Ms. McCarron:

My office is general counsel for Cherokee Freight Lines Stockton LLC ("CFL").  In June 2023, CFL entered into discussions with UKG Inc. ("UKG") as CFL explored the potential for transitioning its human resources information system ("HRIS") and payroll system from its current provider, Paycom, to UKG.  Based upon the representations and assurances of UKG, CFL Vice-President Adam Karp executed a 4-page "Order Form" dated June 28, 2023 (identified as Quote No. Q-176703) provided by UKG, which was also executed on the following day, June 30, 2023, by UKG Senior Order Processing Analyst Scott Giangrande (the "Contract").

Although CFL disputes the applicability, validity, and enforceability of the separate "Master Services Agreement" ("MSA") for the reasons set forth below, for the purpose of this correspondence—and without waiving any rights—**CFL is hereby providing UKG with formal notice pursuant to Section 7.2.2 of the MSA of its intent to terminate the Contract for cause unless UKG satisfactorily addresses and/or otherwise cures the issues identified below within thirty (30) calendar days of UKG's receipt of this correspondence**.

**RELEVANT BACKGROUND**

   **Preliminary Discussions/Contract Execution**

Paycom has been serving as CFL's HRIS and payroll systems provider.  In May 2023, CFL decided to transition those services to another provider, and in connection with those efforts CFL invited UKG to offer a presentation of its services in June 2023, including an explanation as to why CFL should consider transitioning such services to UKG as opposed to a different provider.

The discussions between CFL and UKG were spearheaded by Mr. Karp on behalf of CFL and Account Manager William Feldman on behalf of UKG.  Mr. Karp made clear that CFL desired to transition away from Paycom as soon as possible.  In that regard, Mr. Karp inquired as to the timeframe for completing the platform integrations necessary for the transition and expressed serious concern over any potential for delays.  During those discussions, Mr. Feldman assured

Mr. Karp that the timeframe for completing the platform integrations necessary to transition services from Paycom to UKG would be in the range of four (4) to six (6) months, with the former timeframe assuming a seamless process and the latter assuming potential snags being encountered along the way. Nevertheless, Mr. Feldman assured Mr. Karp that a timeframe of 4 – 6 months would provide more than sufficient time to have the UKG system ready, tested, and fully functional for a **"Go-Live" date of January 5, 2024**. Relying upon Mr. Feldman's assurances, and particularly a "Go Live" date of not later than January 5, 2024, CFL executed the Contract on June 29, 2023, a copy of which is enclosed herewith as **Exhibit A**.

### The On-Boarding Process

UKG did not begin the "Welcome and On-Boarding" process until July 31, 2023, a month after the Contract was executed. The process was led by UKG Implementation Advisor Brian Yao, who utilized the UKG Launch methodology on smartsheets.com to manage timelines, task assignments, and capturing requirements. UKG defines the Launch methodology as:

> UKG's Launch methodology ('Launch') provides proven and repeatable processes that are supported with UKG standard tools, templates and proven training paths that deliver a successful launch of the Subscription Services. UKG and the Customer will collaborate throughout the Launch process performing tasks such as requirements workshops, system configuration, data conversion, integration configuration, testing cycles, production support, and project management.

A portion of this methodology included an "Integration Technical Questionnaire" that CFL completed as part of the information UKG required from CFL to begin the implementation phase. Through such questionnaire, CFL provided a list of all needed vendor integrations and a sample file from each vendor. The screenshots in UKG's smartsheet.com Launch site demonstrate that CFL gathered and timely provide all such required information between July – August 2023.

The CFL leadership team, which included Mr. Karp, Phil Gill, and Robert Manetti, found the process useful and were impressed with Mr. Yao's management skills. This phase captured the tactical requirements for the project, which were outlined in UKG's "Project Scope Summary Confirmation" document that UKG provided to CFL on July 31, 2023 ("Project Summary"), a copy of which is enclosed herewith as **Exhibit B**.

The Project Summary included a callout of the integrations needed and expected at the "Go Live" date. Specifically, Page 2 of the Project Summary identifies necessary "EDI Integrations" with CFL's platforms for "GL, 401k, Benefits" and "API Integrations" with CFL's platform for "Electronic Logging (drivers)," the latter of which is provided through Samsara and is used for all CFL drivers (which comprise the majority of CFL's employees) and thus a critical component to the integration. Consistent with the assurances provided by Mr. Feldman to Mr. Karp, Page 3 of the Project Summary identifies the "Target Live Date" as January 1, 2024, and the "First Live Check Date" as January 5, 2024. Page 6 of the Project Summary states in relevant part: "Approval of the Project Scope Summary Confirmation document confirms an understanding of

the high-level project expectations including the products and services purchased as well as target live dates."  Page 6 further states:

> As an authorized approver on the Project Leadership team, I agree with the following statements regarding the scope of the project:
>
> - The Project Scope Summary Confirmation accurately reflects our understanding of contracted services.
>
> - I understand that additional functionality can be added to this set of deliverables after signing; however new items cannot be guaranteed to be delivered by the stated live date. If they are required as part of 'go-live deliverables', this could potentially impact the live date stated in this document.

## **UKG Fails To Make Progress And Delays The "Go Live" Date**

After successfully completing the "Welcome Phase" as outlined in the UKG Launch methodology, Mr. Yao turned the project over to the UKG implementation team on September 11, 2023, to begin the "Implementation Phase."  UKG Project Manager Jason Martini thereafter assumed the project management responsibilities.  Unfortunately, as clearly established by the below, the Implementation Phase was a miserable failure by UKG.

*September 15, 2023*

Mr. Martini was out of the office for the first week of the Implementation Phase, and thus hands off project management during such time to one or more other UKG personnel.

*September 25, 2023*

The UKG implementation team begins "Full Suite Analysis," work that is largely duplicative of work from the Welcome Phase.  Documentation created during that phase and captured on smartsheet.com is not reused or referenced.

*September 27, 2023*

The UKG implementation team begins "Initial Data Gathering," work that once again is largely duplicative of work from the Welcome Phase.  Documentation created during that phase and captured on smartsheet.com is not reused or referenced.

*October 4, 2024*

First project call with Mr. Martini acting as UKG project manager. Instead of utilizing the Launch methodology as established on smartsheet.com during the Welcome Phase, Mr. Martini is managing the project through a Microsoft Word document he shares during conference calls. The task details and assignments are vague.

*October 9, 2024 - Nov 7, 2023*

The UKG "Configuration Phase" begins. Weekly project meetings led by Mr. Martini continue to be run from a Word document without any tangible tracking or accountability. UKG Launch methodology platform on smartsheet.com continues to not be used.

*November 7, 2023*

Phil Gill of CFL expresses CFL's concerns with Mr. Martini to UKG Account Manager William Feldman by email, highlighting the primary concern that Mr. Martini's mismanagement is leading to delays and misinformation with the integrations, specifically with the Samsara integration which will handle the timekeeping for CFL's truck drivers and which is critical for CFL's success. No resolution is provided.

*November 28, 2023*

Sherrell Davis of UKG reports that all integrations other than the 401k integration will not be available **until June 2024**. The 401k will "likely" be available in late January.

*November 29, 2023*

UKG confirmed at the project meeting that UKG will be unable to provide integrations by the previously stated "Go Live" date of January 5, 2024.

*November 30, 2023*

Mr. Manetti from CFL makes it clear that the "Go Live" date cannot proceed without 401k integration proven to be working ahead of such date. UKG requests that CFL pay for these integrations, which was not only inconsistent with all prior discussions and the Project Summary but was never even previously mentioned as a possibility when CFL outlined the needed integrations. UKG advised that the charge for such ten (10) integrations would start at $2,000.00 each, although in response to CFL's concerns UKG agreed to reduce such charge to $5,000.00 total for all the integrations.

*December 7, 2023*

UKG's Senior Manager of Professional Services Consulting, Pam Christman, sends an email to CFL offering better costs and timelines.

*December 8, 2023*

Mr. Martini and Ms. Christman send a joint email identifying a revised timeline for all integrations to be complete and presenting options for a revised "Go Live" date, with the only viable option for full-integration delaying the "Go Live" date to July 2024.

Mr. Karp responded by email of the same date, stating:

> This new July, 2024 go live date is not going to work for us and
> we've already been very clear in our position that we won't be able
> to go live without a fully functioning system. This leaves us in a
> terrible spot as neither option below are viable options for us. This
> is why we need to speak ASAP to discuss if, how we move
> forward. I was hoping we could have talked earlier today. In light
> of the options provided below, we're now on hold on our side.
> Please let the UKG team know to hold off any meetings that were
> previously scheduled until we decide next steps.
>
> Please let me know as soon as you guys are available for a call.

Ms. Christman responds to Mr. Karp by email of the same date, stating:

> My Director and I are available to meet with you at 4:00 or 4:30
> PST – would that work?
>
> Otherwise, Jason we will look to move up the call early next week.
>
> Please advise.

*December 11, 2023*

Representatives of UKG (David Canup and Pam Christman) participated in a conference call
with representatives of CFL (Adam Karp and Phil Gill).  During the call, UKG represented that
the project is on time and on track and that UKG's services are ready for "Go-Live" in January
2024.  CFL reiterated that integrations are a vital component of the system's efficacy, as UKG
itself documented in the Project Summary.  UKG responded by stating that the integrations were
never part of the Contract, while CFL asserted to the contrary and reiterated that such
integrations were specifically discussed throughout the entire process, including prior to entering
into the Contract, and that UKG was clearly aware of the need for the integrations and the fact
they are critical for a successful launch.  Mr. Karp also suggested that the parties simply part
ways, which UKG resisted and requested that CFL provide a formal letter in such regard.

*December 15, 2023*

Mr. Karp sends an email to Mr. Canup, stating:

> Thank you for the time on our call earlier this week. As you
> suggested, I am writing to express our interest to work through the
> steps needed to terminate our business relationship. I wanted to
> provide you with a brief background and summary why we made
> the decision originally to move to UKG as I feel that's important to
> our position today. Then propose a potential quick resolution.

We ultimately entered into an agreement with UKG based on the assurance that UKG would deliver a complete system ready for launch in January 2024, alongside an ongoing service and product experience we could rely on. This commitment was a significant factor in our decision to collaborate with UKG.

Originally, our PAYCOM system was meeting CFL's core needs. However, despite PAYCOM's operational efficacy, the service aspect led to our decision to seek a new partner. When we transitioned to UKG, we were assured of a service experience far superior to what we had previously encountered. Unfortunately, our experience with UKG has not lived up to these assurances. We are currently facing a six-month delay for go-live, incurring additional time and financial costs. This situation has regrettably eroded our confidence in the promised service experience following the launch.

In the interest of both parties, we propose to negotiate a good faith separation. In the hopes of a quick resolution, CFL is willing to forego any credit or refund of the $20,000 already invested in UKG's LAUNCH professional services, recognizing the efforts made thus far. Regarding the subscription service, we seek to terminate the agreement before its commencement.

Our goal is to resolve this situation swiftly and amicably. We are open to discussing the most effective way to conclude our agreement and are ready to engage in discussions at your earliest convenience.

We understand that this decision is not ideal for either party. However, we believe that an amicable and efficient resolution is in our mutual best interest. We look forward to your response and hope to find a path that minimizes inconvenience and fosters goodwill between our companies.

*December 27, 2023*

After not receiving any response from UKG, Mr. Karp sends a further email to Mr. Canup, stating: "I wanted to follow up to get your thoughts on the proposed resolution below. Please let me know what you think about resolving this amicably."

*December 28, 2023*

After still not receiving any response from UKG, Mr. Karp sends a further email to Mr. Canup, stating:

> I wanted to follow up once more to see how you feel about the below resolution proposal. I've copied Pam in case you are out of

**DOWNEY** BRAND

> the office as I haven't heard back from you. We do need to bring
> this to a resolution and as stated below, we are hoping we can
> resolve this smoothly. If the below is not something UKG is open
> to for some reason, let me know as we'll then need to take the next
> steps to try and resolve this as easily as possible.

*December 29, 2023*

Mr. Canup responds to Mr. Karp, stating: "I apologize for the delay. I will follow up with my internal teams on Tuesday. Would you have time to meet next week so I can give you updates? Please let me know your availability."

Mr. Karp responds by email of the same date, stating:

> At this point my schedule is open Wednesday after 1:00pm PST. If
> you'd like to schedule a call, let me know what time Wednesday
> afternoon will work best for you.
>
> Have a great New Year and I look forward to talking to you next
> week in the hopes we can reach a quick resolution.

*January 10, 2024*

Mr. Karp sends an email to Mr. Canup, again with a copy to Ms. Christman, stating: "I haven't heard from anyone at UKG regarding the resolution of this. I believe you anticipated I would hear something Monday or Tuesday. Please let me know when I can expect to hear something as we'd clearly like to get this resolved and behind us."

*January 11, 2024*

Mr. Canup responds to Mr. Karp by email, stating: "Adam, I will be able to follow up with this today."

*January 12, 2024*

Mr. Karp sends an email to Mr. Canup, again with a copy to Ms. Christman, stating:  "I still haven't heard anything on this."

*January 16, 2024*

Mr. Karp sends a further email to Mr. Canup, again with a copy to Ms. Christman, stating:

> As of today, I still have not heard from anyone with a confirmation
> of what we've discussed regarding terminating our contract.  I sent
> you our termination request, with a proposal as you requested back
> on December 15th.  I have followed up several times and haven't
> been able to get this resolved.  We spoke on Friday and you
> apologized again for the continued delay and let me know you

would email me with the contact information of the person that
you mentioned I will need to talk with for the termination
confirmation (I believe you mentioned his name was Tim?).  I
haven't received that email, or been contacted by anyone else at
UKG.

When you and I talked, we both agreed it would be best to end
things on as much of a positive note as possible.  Yet, I can't seem
to get an official confirmation from you, or anyone else at UKG.
Unfortunately, I can't keep waiting.  If I can't get some type of
confirmation by the end of this week that what I proposed back on
December 15th is agreeable, I will have no choice, but to escalate
this and look to terminate based on cause due to the various
shortcomings by some of the UKG team during this process that
led to this project falling short of what we were promised.  If we're
forced to go that route, we will be seeking a return of all our costs.
I'm still hoping we can avoid this, but will need an official
response by the end of this week.

Please let me know UKG's position ASAP.

*January 17, 2024*

Nikki Aitken, a new UKG customer service representative, enters the picture and emails Mr.
Karp, with a copy to Ms. Canup and Ms. Christman, stating:

Hi Adam – thank you for the follow up, and I apologize for the
delay.  We're still trying to get caught up on customer requests that
came in over the holidays/year-end, but David did pass this along
as soon as you made us aware of your intent to terminate the
partnership.  Can we schedule some time to connect next week?
I'm out of the office tomorrow and just want to ensure I have all of
the contract details and history on the project before we meet.  Let
me know what suits and we'll get something on the calendar.

Mr. Karp responds to Ms. Aitken by email of the same date, stating:

I was told we were already past the discovery phase and the need
for UKG to now look into the contract details and history on the
project.  This has been lingering for over a month without an
answer and we need to reach a resolution one way or another.  I
was told that I was just waiting for a final confirmation from the
right department that what I proposed was agreeable.  Will you be
able to provide a final official answer when we speak next week?

I'm available Monday between 9am-12:00pm PST.

Ms. Aitken responds by email of the same date, stating: "Hi Adam – yes, I will be able to provide an answer when we meet next week. Can you propose a time for Wednesday or Thursday? I need a couple of days internally to pull together the contract details and meet with the project team."

Mr. Karp responds by email of the same date, stating: "I can make myself available Wednesday from 9:00am-12:00pm PST."

*January 25, 2024*

After several weeks of nudging and fruitless negotiations, UKG demands a year's payment to terminate the Contract. By email to Mr. Karp, Ms. Aitken states:

> Hi Adam – thank you for taking the time to speak with me yesterday. As we discussed yesterday, UKG is not aligned to the proposal Cherokee has set forth, which is to end the partnership and forgo all subscription fees, considering the $20,000 Launch fees that have already been paid Cherokee's only financial obligation. UKG remains committed to delivering the project as scoped; if Cherokee wishes to terminate the relationship prior to fulfillment of the initial contract term, we will seek additional payment of one year of the subscription fees, totaling $115,200.
>
> I realize what the likely next steps are based on our conversation, and I am already engaged with our legal counsel on that front. Please let me know how you would like to proceed.

### Concerns Regarding UKG's Data Security/Legal Compliance

Based upon information recently gathered through various online resources, CFL has discovered critical information regarding actual or potential deficiencies in UKG's data security systems which were never disclosed to CFL. Specifically, it appears that in December 2021, UKG experienced a significant data breach to one of its cloud-based time and attendance systems, which resulted from a ransomware attack and unfortunately caused severe consequences for thousands of UKG's customers. The hack apparently resulted in outages across UKG's system for weeks, affecting over 2000 companies from hospitals to government agencies. The data breach forced employers to manually track employee time and caused difficulties managing end-of-year vacations and payroll and bonus calculations.

Although UKG restored most system capabilities within about six weeks, concerns remained over whether the breach left employee information exposed and whether some employers had violated the Fair Labor Standards Act (FLSA). Since January 19, 2022, lawsuits have been filed against employers in connection with the security breach, and the claims range from recouping back wages and overtime pay (due to unrecorded working hours during the breach and the additional time employees spent tracking their hours) to security-based claims over the employer's failure to adequately protect employees' private information, such as their social security numbers.

**DOWNEY** BRAND

Although UKG settled a class action lawsuit for roughly $6,000,000.00, and went on record assuring its customers that the deficiencies in its systems have since been fully resolved, it appears that UKG experienced yet another data breach on June 23, 2023—approximately one week prior to CFL entering into the Contract with UKG.  According to online records, this second data breach—which UKG also entirely failed to disclose to CFL—was discovered by UKG on October 30, 2023, and resulted in unauthorized access to confidential and protected consumer information associated with UKG's customers, including names, Social Security numbers, demographic information, salary information, addresses and financial account information.

The foregoing data breaches are especially concerning in light of other lawsuits that have been filed against UKG and the positions UKG has taken in those cases.  For example, in a 2021 case filed in the United States District Court, Western District of Washington, entitled *Recreational Equip., Inc. v. UKG, Inc.*, Case No. C21-0107JLR, REI alleged that, as a result of UKG's alleged breach of a contract to provide REI with software, services, and Software as a Service ("SaaS") services related to payroll administration, REI sustained damages in the form of a settlement payment and associated legal fees in the sum of $5,413,036.74 for an underlying lawsuit in California in which the plaintiffs alleged REI violated California labor laws by, among other things, providing inaccurate wage statements.  Despite the settlement with the class members being approved by the court and fully funded by REI, UKG refused to reimburse any portion of such amounts to REI and instead launched an aggressive and frivolous defense, including filing a motion to dismiss the action.  In footnote 2 of its opinion denying UKG's motion, the federal district court chastised UKG for taking such a frivolous approach, stating:

> The court agrees with REI that 'even the most cursory review of cases or commentary would have confirmed' that UKG's arguments in favor of dismissal are without merit. (See Resp. at 2.) The court encourages UKG to conduct such a review before filing a motion in the future. If it fails to do so, the court may determine that sanctions are warranted. See Fed. R. Civ. P. 11.

## NOTICE TO TERMINATE FOR CAUSE/APPLICABLE LAW

### Notice To Terminate For Cause

Although CFL disputes the validity and enforceability of the MSA for the reasons set forth below, CFL is willing to provide UKG with an opportunity to "cure" the breaches and/or anticipatory breaches identified below pursuant to Section 7.2.2 of the MSA, and CFL does so strictly for the purpose of this correspondence and without in any way, expressly or impliedly, waiving such position.

Section 7.2.2 of the MSA states in relevant part:

> 7.2.2  **For Cause**.  Either Party may terminate this Agreement, or any Service identified in an Order, if the other Party fails to perform any material obligation under this Agreement, and such Party is not able to cure the non-performance within thirty (30)

days of written notice of such default with reasonably sufficient
detail regarding the alleged breach … .

**Thus, pursuant to Section 7.2.2 of the MSA, CFL hereby demands that UKG provide
and/or perform the following within thirty (30) days of UKG's receipt of this
correspondence:**

**1.      That UKG implement all necessary integrations identified in the Project Summary
to ensure a seamless transition with a "Go Live" date that is within thirty (30) days of
UKG's receipt of this correspondence;**

**2.      That UKG provide CFL with full disclosure of the facts giving rise to the data
breaches addressed above and the measures that UKG has since taken to address any and
all system deficiencies that caused or contributed to such breaches; and**

**3.      That UKG provide CFL with written representations and warranties (a) as to any
and all security certifications possessed by UKG, including any recognized security
standards or attestations of compliance (i.e., Service Organization Controls (SOC) 2
Certification, or Payment Card Industry Data Security Standard (PCI–DSS) Compliance);
(b) confirming that UKG conducts regular security assessments of its systems that identify
potential data breach and related risks; and (c) estimating the likelihood and potential
impact of those risks with respect to the platform and systems to be provided by UKG to
CFL pursuant to the Contract.**

If UKG is not willing or able to timely cure such issues, the Contract will be deemed terminated
pursuant to Section 7.2.2 of the MSA.

### Applicable Law

So that UKG can make an informed decision as to the appropriate path forward, below is a
summary of some of the obvious legal obstacles UKG will encounter under its contract
documents.

As set forth above, on June 29, 2023, CFL Vice-President Adam Karp executed the 4-page
Contract, which consisted of an "Order Form" dated June 28, 2023 (identified as Quote No. Q-
176703) provided by UKG.  The first sentence in the section entitled "**Order Notes**" on page 3
of the Contract states:  "Despite any Statement of Work linked above, UKG Launch shall be
provided as set forth in the attached UKG Launch – UKG Pro Statement of Work."  However, no
such document was attached or ever provided to CFL.

The last paragraph of the "Order Notes" section, which is in smaller font than the preceding
paragraph, states:

This Order is subject to and governed by the terms and conditions of UKG's Master Services Agreement located at: www.ukg.com/msa (hereafter, "Agreement"). All versions of the Master Services Agreement, including the version effective as of the Effective Date of this Order and prior versions, can be found at: www.ukg.com/global-msas UKG will provide the Services in accordance with the Services Descriptions and Statements of Work located at: www.ukg.com/services-descriptions UKG will secure the Support Services in accordance with the UKG Support Policy located at: www.ukg.com/support-policies-and-services All Customer Data (as defined in the Agreement) will be secured and protected as set forth in the Technical and Organizational Measures of UKG's Data Processing Addendum. Any personal data provided to UKG through the Subscription Services will be processed in accordance with UKG's Data Processing Addendum located at: www.ukg.com/ukg-unified-dpa Customer's use of the Subscription Services is further subject to the Acceptable Use Policy located at: www.ukg.com/acceptable-use-policy

Setting aside whether and to what extent the foregoing provision in the Contract properly incorporates any of the documents referenced therein, it is clear that UKG will be bound to the January 5, 2024, "Go Live" date with all identified integrations for at least two separate reasons.

First, as detailed above, the integrations and the January 5, 2024, "Go Live" date are expressly set forth in the Project Summary prepared by UKG and provided to CFL on July 31, 2023. "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Cal. Civil Code § 1642; *Brown v. California Pension Administrators & Consultants* (1996) 45 Cal.App.4th 333, 344.) Although Civil Code section 1642 refers expressly to "several contracts" as parts of "substantially one transaction," case law makes clear that the several writings need *not* each be contracts, and that they need not be executed on the same day or within any particular period of time. (*Cadigan v. American Trust Co.* (1955) 131 Cal.App.2d 786, 787; *Goodman v. Community Savings & Loan Assn.* (1966) 246 Cal.App.2d 13, 20 [where deposit receipt and acceptance contained several terms important to plaintiff purchaser, these were part of the contract though left out of defendant vendor's escrow instructions]; *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1320 [order form, residential customer agreement, service agreements, and promotion agreement, relating to homeowners' order for bundled telephone, Internet, and satellite television service, were so interrelated as to be considered one contract, notwithstanding slightly different areas of concern and different counterparties].) In fact, to the extent there is any inconsistency between the Project Summary, the Contract, the MSA, or any other documents referenced in the Contract, the terms of the Project Summary will control since it was prepared and provided by UKG a month after the Contract was executed. (See *Frangipani v. Boecker* (1998) 64 Cal.App.4th 860, 863 [later escrow instructions superseded inconsistent provisions of earlier contract].)

Second, any conflicts or ambiguities in the contract documents as to whether UKG is bound to the January 5, 2024, "Go Live" date will be resolved against UKG and in favor of CFL. There can be no dispute that the Contract is one of adhesion, which is defined as a standardized contract drafted by a party with superior bargaining power and imposed upon the other party on a take-it-or-leave-it basis. (*Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694.) While ambiguities in a contract are to be "interpreted most strongly against the party who caused the uncertainty to exist." (Civil Code § 1654; see also *Basin Oil Co. of Calif. v. Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 595), this rule "applies with peculiar force in the case of the contract of adhesion." (*Neal, supra,* 188 Cal.App.2d at 695; see also *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 801["[I]f the uncertainty is not removed by application of the other rules of interpretation, a contract must be interpreted most strongly against the party who prepared it. This last rule is applied with particular force in the case of adhesion contracts."].)

Further, aside from provisions of an adhesion contract being construed against the drafter, such a contract or particular provisions thereof may be deemed completely unenforceable where either the subject provision was not within the reasonable expectations of the weaker or "adhering" party at the time the contract was made or, even if it was within the parties' reasonable expectations, when the particular provision in context is unduly oppressive or "unconscionable." (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820 ["a principle of equity applicable to all contracts generally"]; see also Civil Code § 1670.5(a) ["If the court finds as a matter of law the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract … or it may so limit the application of any unconscionable clause to avoid any unconscionable result."].)  In *Zullo v. Superior Court (Inland Valley Publishing)* (2011) 187 Cal.App.4th 477, the Court of Appeal explained:

> Unconscionability has both procedural and substantive elements. 'The procedural element focuses on two factors: 'oppression' and 'surprise.' [Citations.] 'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' [Citations.] 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms.' [Citations omitted]. Substantive unconscionability refers to overly harsh or unjustifiable one-sided results. A contract is largely an allocation of risks between the parties. A contractual term is substantively suspect if, viewed at the time the contract was formed, it allocates the risks in an unreasonable or unexpected manner. [Citations omitted.]
>
> Both forms of unconscionability must be present in order to invalidate a contract for unconscionability but they need not be present in equal parts. '[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' [Citations omitted.]  (Id. at 484.)

The Court of Appeal in *Zullo* addressed the issue of whether an employee was bound to an arbitration agreement that was included in the company handbook that she was provided and signed upon being hired.  In holding that the arbitration agreement was unenforceable, the Court of Appeal concluded that "there is really no question that the arbitration agreement is procedurally unconscionable in that it is a contract of adhesion," noting, among other things, that it "was oppressive to require the party to make an independent inquiry to find the applicable rules in order to fully understand what she was about to sign" and further noting that such agreement provided more rights and remedies to the drafter than it did to the plaintiff.  (*Id.* at 485-486.)

The same reasoning applies here. UKG prepared the 4-page Contract and provided it to CFL for execution, burying the reference to the MSA and several other documents under the section "Order Notes" and in font that was smaller than the preceding paragraph.  Adding insult to injury is the fact the MSA contains various provisions that are extremely one-sided in favor of UKG,

unconscionable, and for which CFL had no opportunity to negotiate.  Highlighting this point is Section 10.1 of the MSA:

> **10.1  Jurisdiction & Dispute Resolution.** This Agreement is governed by and is to be interpreted solely in accordance with the laws of the Commonwealth of Massachusetts, without regard to any conflict of law provision that would result in the application of a different body of law, and each Party agrees to submit to exclusive venue in the courts in Boston, Massachusetts in any dispute arising out of or relating to this Agreement.   IF NOT OTHERWISE PROHIBITED BY APPLICABLE LAW, EACH PARTY AGREES THAT ANY CLAIM RELATED TO THIS AGREEMENT WILL BE RESOLVED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED, OR REPRESENTATIVE ACTION, SUIT, OR OTHER SIMILAR PROCESS. The United Nations Commission on International Trade Law, the United Nations Convention on Contracts for the International Sale of Goods, and the Uniform Computer Information Transactions Act (UCITA) will not apply to this Agreement.

Although the Contract identifies UKG's location as Weston, Florida, and although CFL is located in Stockton, California, Section 10.1 of the MSA attempts to apply the laws of Massachusetts as the governing law.  "[A]n agreement designating applicable law will not be given effect if it would violate a strong California public policy."  (*Frame v. Merrill Lynch, et al.* (1971) 20 Cal.App.3d 668, 673.)  Considering the nature of the Contract and the fact that UKG would be providing services that are heavily regulated by California labor, privacy, and related laws, there is no doubt that California law will be held to apply here.  (See also *Klussman v. Cross Country Bank* (2005) 134 Cal.App.4th 1283, 1293 [because Delaware law permitting waivers of classwide arbitration conflicted with fundamental California policy, choice-of-law provision choosing Delaware law was invalid]; *ABF Capital Corp. v. Grove Properties Co.* (2005) 126 Cal.App.4th 204, 214 [California statute mandating reciprocity of contractual attorneys' fees provisions governed contract, despite unilateral attorneys' fees provision in contract and choice-of-law provision stating that New York law would govern].)

Section 10.1 of the MSA also provides that "each Party agrees to submit to exclusive venue in the courts in Boston, Massachusetts in any dispute arising out of or relating to this Agreement." Once again, this provision is also squarely unenforceable.  "The rules to determine in what courts and counties actions may be brought are fixed upon consideration of general convenience and expediency by general law; to allow them to be changed by the agreement of the parties would disturb the symmetry of the law, and interfere with such convenience. Such contracts might be induced by considerations tending to bring the administration of justice into disrepute." (*General Acceptance Corp. of Calif. v. Robinson* (1929) 207 Cal. 285, 289; see also *Aral v. Earthlink* (2005) 134 Cal.App.4th 544, 561 [forum selection clause in Internet service contract providing all actions would be brought in Georgia was unenforceable]; *Arntz Builders v. Superior Court* (2004) 122 Cal.App.4th 1195, 1207.)

In short, UKG induced CFL into executing the adhesion Contract by making promises and assurances as to the integrations and the January 5, 2024, "Go Live Date," and proceeded to confirm those promises and assurances in the Project Summary UKG prepared and provided to CFL on July 31, 2023.  Based upon the foregoing legal authorities, to the extent there are any ambiguities or conflicts between the Project Summary and the other contract documents, the Project Summary will control and they will be construed against UKG and in favor of CFL.

Elizabeth McCarron
February 22, 2024
Page 15

**<u>CONCLUSION</u>**

Through its Sacramento, San Francisco, and Stockton offices, Downey Brand LLP represents
numerous corporate clients who utilize the services of UKG, and quite frankly the approach that
UKG has taken with respect to this matter is surprising and disturbing, to say the least.  CFL has
attempted to resolve this dispute in good faith, offering to allow UKG to retain CFL's
$20,000.00 deposit, while UKG rejected such offer and demanded that CFL make "payment of
one year of the subscription fees, totaling $115,200."  Considering that UKG clearly failed to
perform its obligations under the Contract, and that CFL has sustained significant damages as a
result thereof, CFL will not agree to UKG's demand.

As set forth above, although CFL disputes the validity and enforceability of the MSA, CFL is
willing to provide UKG with an opportunity to "cure" the breaches and/or anticipatory breaches
identified above pursuant to Section 7.2.2 of the MSA, and CFL does so strictly for the purpose
of this correspondence and without in any way, expressly or impliedly, waiving such position.  If
UKG is not willing or able to timely cure such issues, the Contract will be deemed terminated
pursuant to Section 7.2.2 of the MSA.

If you have any questions or wish to discuss this matter, please do not hesitate to contact me.

Very truly yours,

DOWNEY BRAND LLP

Anthony L. Vignolo

ALV:bs

Enclosures

**DOWNEY** BRAND

# Exhibit A

DocuSign Envelope ID: 68E50C7C-12A5-47A4-B9D5-0EF37B8F2663
Case 1:24-cv-12714-ADB    Document 1-3    Filed 06/28/24    Page 48 of 59

Quote#: Q-176703
Page 1/4



## ORDER FORM

**Quote#: Q-176703**
**Expires: 20 Jul, 2023**
**Sales Executive: William Feldman**
**Effective Date: Effective as of the date of last signature of this Order**
**Division: Strategic - Southwest**

**Order Type: Quote**
**Date: 28 Jun, 2023**

---

**Customer Legal Name: Cherokee Freight Lines Stockton LLC**

**Customer Legal Address:**
**3655 Cherokee Rd, Stockton, CA**
**95205-2403 USA**

**Bill To Contact:**

**Bill To: Cherokee Freight Lines**
**P.O. Box 5509**
**Stockton, CA 95215 USA**

**Ship To Contact: Adam Karp**

**Ship To: Cherokee Freight Lines Stockton LLC**
**3655 Cherokee Rd**
**Stockton, CA 95205-2403 USA**

**Ship to Phone: (209) 444-7344**
**Contact: Adam Karp**
**Email: akarp@gocfl.com**

---

**Currency: USD**
**Customer PO Number:**
**Solution ID: 6198884**
**Initial Term: 36 months**
**Uplift Percent: 5 %**

**Renewal Term: 12 months**
**Payment Terms: Net 30 Days**

**Billing Start Date: 274 Days from the Effective Date; unless otherwise stated below.**
**Data Center Location: USA**

---

**Payment Fees**

A) Subscription Fee

The Subscription Fees for the applicable monthly Minimum Quantities are due quarterly and invoiced thirty (30) days in advance of the quarter.

To reconcile the actual employee counts, promptly following the end of each quarter term starting from the Billing Start Date, UKG will invoice Customer for the actual number of employees in each month of the previous quarter term that exceeded the Monthly Minimum Quantity.

---



The monthly subscription amount (number of employees multiplied by the applicable Subscription Fee) may increase or decrease if the number of employees increases or decreases, but in no event shall the monthly Subscription Fee be calculated on less than the Monthly Minimum Quantity below.

After the Initial Term, the Subscription Fee shall increase per annum by the Uplift amount set forth above.

## Subscription Services

| Subscription Services | Monthly Minimum Quantity | Employee Type | Subscription Fee Per Employee Per Month | Billing Start Date / Billing Frequency |
|---|---|---|---|---|
| Includes UKG PRO PAY AND PEOPLE CENTER,UKG PRO WORKFORCE MANAGEMENT (HOURLY),UKG PRO ABSENCE,UKG PRO DOCUMENT MANAGER,UKG PRO PEOPLE ASSIST,UKG PRO EMPLOYEE VOICE,GREAT PLACE TO WORK CERTIFICATION - ASSESS TIER,INCOME AND EMPLOYMENT VERIFICATION FROM EQUIFAX,UKG PRO ONBOARDING,UKG PRO PAY,UKG PRO PEOPLE CENTER,UKG PRO PAYMENT SERVICES,UKG PRO BENEFITS ENROLLMENT,UKG PRO BASIC SSO,UKG PRO MODEL MY PAY,UKG PRO DATA EXCHANGE SERVICES,UKG PRO ACA SERVICES,UKG PRO ACCRUAL,UKG PRO TIMEKEEPING HOURLY,UKG PRO WAGE ATTACHMENT DISBURSEMENT,UKG PRO TAX FILING SERVICES,UKG PRO CHECK PRINTING | 320 | Compensated Employees | USD 29.00 | 274 Days from the Effective Date / Quarterly in Advance |
| Includes UKG PRO HR ONLY/GLOBAL EMPLOYEES | 0 | People Center Employees | USD 4.00 | 274 Days from the Effective Date / Quarterly in Advance |
| Includes UKG PRO LIMITED ACCESS | 0 | Limited Access Employees | USD 1.00 | 274 Days from the Effective Date / Quarterly in Advance |

## Professional Services

Billing Frequency: Billed 100% upon signature of the order form

| Professional Services | Total Price |
|---|---|
| UKG LAUNCH FIXED FEE | USD 20,000.00 |
| **Total Price** | **USD 20,000.00** |

## Quote Summary



| Item | Total Price |
|------|-------------|
| Minimum Monthly Subscription Services Fees | USD 9,279.94 |

| Item | Total Price |
|------|-------------|
| Total Professional Services Fees | USD  20,000.00 |

**Order Notes:**

Despite any Statement of Work linked above, UKG Launch shall be provided as set forth in the attached UKG Launch – UKG Pro Statement of Work. UKG Launch is based on the Launch Quantity of 390 employees. In the event that the number of Customer's employees exceeds 110% of the Launch Quantity herein as of the applicable Subscription Service live date, then Customer agrees to pay UKG $185.00 per each additional employee. For clarification purposes, this additional Launch fee if applicable shall only be charged to Customer as of the applicable Application live date and Customer shall not be charged for any additional Launch fees subsequent to that date.

During the Initial Term, in the event Customer has a significant change in business resulting in a reduction of more than twenty percent (20%) of the minimum number of Compensated Employees for more than three (3) consecutive months, Customer shall notify UKG of such reduction and upon such notification, the Parties agree to in good faith renegotiate the minimum number of Compensated Employees, including the decrease or increase, if any, of the fees.

This Order is subject to and governed by the terms and conditions of UKG's Master Services Agreement located at: www.ukg.com/msa (hereafter, "Agreement"). All versions of the Master Services Agreement, including the version effective as of the Effective Date of this Order and prior versions, can be found at: www.ukg.com/global-msas UKG will provide the Services in accordance with the Services Descriptions and Statements of Work located at: www.ukg.com/services-descriptions UKG will provide the Support Services in accordance with the UKG Support Policy located at: www.ukg.com/support-policies-and-services All Customer Data (as defined in the Agreement) will be secured and protected as set forth in the Technical and Organizational Measures of UKG's Data Processing Addendum. Any personal data provided to UKG through the Subscription Services will be processed in accordance with UKG's Data Processing Addendum located at: www.ukg.com/ukg-unified-dpa Customer's use of the Subscription Services is further subject to the Acceptable Use Policy located at: www.ukg.com/acceptable-use-policy



IN WITNESS WHEREOF, the parties have caused this Order to be executed by their authorized representatives and shall be effective as of the date of the last signature below.

| **Cherokee Freight Lines Stockton LLC** | | **UKG Inc.** | |
|---|---|---|---|
| Signature: | *Adam Karp*<br>83CC720E0073443... | Signature: | *Scott Giangrande*<br>7074C511ADA043B... |
| Name: | Adam Karp | Name: | Scott Giangrande |
| Title: | Vice President | Title: | Sr. Order Processing Analyst |
| Date: | 29-Jun, 2023 | Date: | 30-Jun, 2023 |

The monthly price on this Order has been rounded to two decimal places for display purposes. As many as eight decimal places may be present in the actual price. Due to the rounding calculations, the actual price may not display as expected when displayed on your Order. Nonetheless, the actual price on your invoice is the true and binding total for this Order for purposes of amounts owed for the term.

# Exhibit B

# UKG Launch Project
## Project Scope Summary Confirmation



The Project Scope Confirmation outlines work to be performed, and communicate assumptions involved with the project. Customer's project team must review and sign this document to ensure the UKG project team is aware of the project objectives and demonstrates an understanding of the overall scope of this project, based upon information provided to date and subject to change based on further discovery during analysis as well as the Launch Agreement.

# Company Information

| Company Information | | |
|---|---|---|
| AR# | CHE1500 | |
| Company Name | Cherokee Freight Lines | |
| Company Website | http://www.gocfl.com | |
| Main Location (City, State, Providence) | 3655 Cherokee Rd Stockton, CA 95205-2403 | |
| Main Location Time Zone | PST | |
| # of FEINs/BNAs/Legal Entities | US: | 4 |
| | CAN: | 0 |
| | International: | 0 |
| Total Current Employee Count | 320 | |
| Current Employee Count | US: | 320 |
| | CAN: | 0 |
| | International: | 0 |
| # of Physical Locations | US: | 2 |
| | CAN: | 0 |
| | International: | 0 |
| Pay Frequency(s) | US: | Weekly |
| | CAN: | N/A |
| | International: | N/A |
| Number & List of US States Employees are Taxed in | 5-10 | |
| | Arizona, California, Idaho, Nevada, Oklahoma, Oregon, Texas, Washington | |
| Local Taxes (US)<br>AL, CO, IN, KY, MD, MI, MO, NM, NV, NY, OH, OR, PA, WA, WV | OR | |
| Canadian Provinces/Territories in Scope | N/A | |
| Quebec Reporting | N/A | |
| Countries in Scope Outside of US & Canada | N/A | |
| Number of Unions | 4 | |
| Non-Profit | No | |

1

© 2020 UKG Inc. All rights reserved.



| Company Information | |
|---|---|
| Migrating from PEO | No |
| Language Requirements | |
| Additional Notes | |
| | |

# Current System Information

| Current System Information | | |
|---|---|---|
| Current HR System(s) | US: | Paycom |
| | CAN: | N/A |
| | International: | N/A |
| Current Payroll System(s) | US: | Paycom |
| | CAN: | N/A |
| | International: | N/A |
| Current Time & Attendance System(s) | US: | Paycom, Electronic Logging (drivers) |
| | CAN: | N/A |
| | International: | N/A |
| Current Scheduling System(s) | US: | N/A |
| | CAN: | N/A |
| Current Financial System(s) (GL) | US: | Mcleod |
| | CAN: | N/A |
| EDI Integrations | GL, 401k, Benefits | |
| API Integrations<br><br>*Customer is responsible for delivery (including setup & testing) of API integrations by leveraging the provided UKG API Guides and developer resources* | Electronic Logging (drivers) | |
| Custom Reports | | |

2

© 2020 UKG Inc. All rights reserved.

UKG

| Current System Information | |
|---|---|
| Historical Employee Data | history from 2020 on |
| Additional Notes | |
| | |

## UKG Applications and Target Dates of Deployment

| UKG Application | In Scope | Target Live Date | | |
|---|---|---|---|---|
| **Human Resources and Payroll** | | | | |
| US Pay and People Center | ☑ | 01/01/24 | First Live Check Date: | 01/05/24 |
| US People Center Only | ☑ | 01/01/24 | | |
| US Pay Only | ☑ | 01/01/24 | | |
| Canada Pay and People Center | ☐ | N/P | First Live Check Date: | N/P |
| Canada People Center Only | ☐ | N/P | | |
| Canada Pay Only | ☐ | N/P | | |
| Global People Center | ☑ | N/A | | |
| Position Management | ☐ | | | |
| Human Resources and Payroll Notes | | | | |
| | | | | |

| Time & Labor Management | | | | |
|---|---|---|---|---|
| Workforce Management | ☑ | 01/01/24 | Pay Period US: | 12/23-12/29 |
| | | | Pay Period CAN: | N/P |
| WFM - Pro Absence | ☑ | P2 | | |
| WFM - Pro Scheduling | ☐ | N/P | | |
| WFM - Pro Advanced Scheduling | ☐ | N/P | | |
| WFM - Pro WFM Analytics | ☐ | N/P | | |
| WFM - Pro Activities | ☐ | | | |
| Time & Scheduling | ☐ | N/P | | |
| Clock Hardware | ☐ | Estimated # of Clocks: | | |

Project Scope Summary Confirmation

© 2020 UKG Inc. All rights reserved.

UKG

| UKG Application | In Scope | Target Live Date | | |
|---|---|---|---|---|
| Global Time Keeping | ☐ | US | | |
| **Time & Labor Management Notes** | | | | |
| | | | | |

| **Benefits Administration & Comp** | | | | |
|---|---|---|---|---|
| Pro Benefits – Open Enrollment | ☑ | P2 | Open Enrollment Start: | 08/01/23 |
| | | | Benefit Effective Date: | 09/01/23 |
| Pro Benefits – Life Events | ☑ | | P2 - Target within 0-30 days of HR go-live | |
| Benefits Administration (Prime) | ☐ | N/P | | |
| Benefits API (Third Party Provider) | ☐ | | N/A - Not in scope | |
| Compensation | ☐ | | N/A - Not in scope | |
| **Benefits Administration & Comp Notes** | | | | |
| | | | | |

| **Talent Acquisition** | | | | |
|---|---|---|---|---|
| Recruiting | ☐ | | N/A - Not in scope | |
| Onboarding | ☑ | | P2 - Target within 0-30 days of HR go-live | |
| **Talent Acquisition Notes** | | | | |
| | | | | |

| **Talent Management** | | | | |
|---|---|---|---|---|
| Performance Reviews | ☐ | | N/A - Not in scope | |
| Succession | ☐ | | N/A - Not in scope | |
| Coaching & Development | ☐ | | N/A - Not in scope | |
| **Talent Management Notes** | | | | |
| | | | | |

4

© 2020 UKG Inc. All rights reserved.



| UKG Application | In Scope | Target Live Date | |
|---|---|---|---|
| **Human Resource Service Delivery** | | | |
| Document Manager | ☑ | | TBD - To be discussed further with Launch Team |
| People Assist | ☑ | | TBD - To be discussed further with Launch Team |
| Human Resource Service Delivery Notes | | | |
| | | | |
| **Workforce Intelligence** | | | |
| Voice | ☑ | | P2 - Target within 0-30 days of HR go-live |
| Learning | ☐ | | N/A - Not in scope |
| Workforce Intelligence Notes | | | |
| | | | |

| **Payment and IT Services** | |
|---|---|
| US Payment Services – Tax Filing | ☑ |
| US Payment Services – Wage Attachment | ☑ |
| US Payment Services – 1099 Filing | ☐ |
| Canada Payment Services – Tax Filing | ☐ |
| US New Hire Reporting | ☑ |
| US Multi Worksite Reporting | ☑ |
| US Employee Pay | ☑ |
| US ACA Services | ☑ |
| Managed Services | ☐ |
| Print Services | ☑ |
| Test Environment Services | ☐ |
| Single Sign-On (SSO) | ☑ |
| Payment and IT Services Notes | |
| | |

5

© 2020 UKG Inc. All rights reserved.



## Launch Assumptions

1. Project will be managed per the UKG Launch Methodology section referenced in the SaaS Agreement.

2. If the first Live Payroll in UKG is processed other than the first check in January, Customer is responsible for any notices, adjustments, or amendments for items prior to the first live check date.

3. Customer's business environment will not impact the implementation (e.g., no acquisitions or major organizational changes anticipated).

4. Customer's project team members will attend all necessary UKG training courses.

5. This project may require an additional account setup or authorization with Customer's bank.

6. Customer is responsible for maintaining all aspects of UKG Pro security administration.

7. UKG and Customer management support will be readily available to resolve issues to avoid negative impact on the project schedule and/or cost.

8. Assumes Customer provides committed team members to facilitate timely decisions, effective communication, issue resolution, and tasks completion.

9. User procedures, communication, and training of employees are the responsibility of Customer.

10. Customer is responsible for executing and validating test results with support from the Launch team.

11. This Project Scope Confirmation document will be reviewed and, together with the requirements document in the Launch Tool, signed-off prior to proceeding with configuration.

## Project Scope Summary Confirmation Approval

Approval of the Project Scope Summary Confirmation document confirms an understanding of the high-level project expectations including the products and services purchased as well as target live dates.

While this is not a contract, it does help all parties involved understand the overall scope and timeline.

As an authorized approver on the Project Leadership team, I agree with the following statements regarding the scope of the project:
- The Project Scope Summary Confirmation accurately reflects our understanding of contracted services.
- I understand that additional functionality can be added to this set of deliverables after signing; however new items cannot be guaranteed to be delivered by the stated live date. If they are required as part of 'go-live deliverables', this could potentially impact the live date stated in this document.

## Acknowledgement

**COMMENTS:**

6



**ACCEPTED BY:**

_____

**Approver-Name**

**DATE:**

7

© 2020 UKG Inc. All rights reserved.

